IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | |
|---|---|
| PATSY DOBSON, ) | |
| ) | |
| Claimant, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 6:13-CV-01434-KOB |
| CAROLYN W. COLVIN, ) | |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Respondent. ) | |
| ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On February 24, 2011, the claimant, Patsy Dobson, applied for disability insured benefits under Title II and supplemental security income under Title XVI of the Social Security Act. (R. 116-24, 125-28). The claimant initially alleged that she became disabled on October 9, 2008. (R. 138). The Commissioner denied the claimant's applications. (R. 65-66). The claimant filed a timely request for a hearing before an Administrative Law Judge. (R. 74). At the June 27, 2012 hearing, the claimant amended her alleged disability onset date to July 20, 2010. (R. 26).

On July 27, 2012, the ALJ issued a decision denying the claimant's applications, finding that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for social security benefits. (R. 19). The Appeals Council denied the claimant's request for a review of the hearing decision on June 13, 2013. (R. 1). Consequently, the ALJ's decision

became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the court REVERSES AND REMANDS the decision of the Commissioner.

## II. ISSUE PRESENTED [1]

The claimant presents the following issue for review: whether the ALJ properly rejected the opinions of the claimant's treating physicians based on

(a) inconsistencies in her medical records from the Florida and Alabama facilities; and

(b) the claimant's non-compliance with treatment in Alabama.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims.*" Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence.

---

[1] The claimant also argues that substantial evidence does not support the ALJ's finding that the claimant could perform jobs that exist in significant numbers in the national economy because the claimant's physical impairments would preclude her from working. Because the court finds merit in the claimant's first argument, the court does not need to address this second issue.

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986). A decision is not based on substantial evidence that focuses on one aspect of the evidence while disregarding other contrary evidence. *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[2]; 20 C.F.R. §§ 404.1520, 416.920.

Furthermore, in evaluating the severity of the claimant's impairments, "[t]he testimony of a treating physician must ordinarily be given substantial or considerable weight unless 'good cause' is shown to the contrary." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). If good cause is not shown, the ALJ may not discount the treating physician's opinion. *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1986). The ALJ may not substitute his

---

[2]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

judgment for the judgment of the physicians and draw his own conclusions about the claimant's medical records. *Hillsman*, 804 F.2d at 1182. Failure to specify a reason for disregarding a treating physician's opinion constitutes reversible error on the part of the Commissioner. *Id.* at 1053; *Broughton v. Heckler*, 776 F.2d 960, 961-62 (11th Cir. 1985).

## V. FACTS

The claimant was 56 years old on the date of the ALJ's decision. (R. 18, 19, 29). She has a ninth grade education and has not obtained her GED. (R. 30). The claimant has past relevant work experience as a caregiver, but has not engaged in substantial gainful activity since her amended alleged onset date of July 20, 2010. (R. 11, 18). The claimant alleges disability based on depression and generalized anxiety disorder. (R. 27, 158).[3]

*Mental and Physical Impairments*

The claimant received treatment for her mental health impairments at institutions in both Florida and Alabama. The claimant's records for Winter Haven Hospital Behavioral Health Division in Florida reflect psychiatric treatment dating back to January 2002. During her treatment at Winter Haven, the claimant received GAF scores ranging from a high of 75 in 2005, indicating no more than slight impairment in social, occupational, or school functioning, (R. 244-46) to a low of 40 in 2009, indicating some impairment in reality testing or communication, as well as major impairment in several areas, such as work or school, family relations, judgment,

---

[3] The court notes that although the claimant's medical records do occasionally reference the claimant's arthritis, obesity, or other physical impairments, the claimant did not allege any physical impairments either in her application for disability or in her testimony at the ALJ hearing. (R. 27, 158).

thinking, or mood. (R. 220). On April 21, 2008, a physician at Winter Haven diagnosed the claimant with Major Depressive Disorder and Generalized Anxiety Disorder. (R. 227).[4] While at Winter Haven, the claimant's physicians noted that she was overweight, and had arthritis and nerve pain; however, the physicians at Winter Haven only treated the claimant for her mental impairments. No records indicate that the claimant sought or received treatment for any of these physical impairments during the time period that she visited the Winter Haven facility for her mental impairments. The claimant last visited Winter Haven on May 12, 2010. At this visit, the claimant reported that she was "feeling much better" and received a GAF score of 66. (R. 214-19).

In the summer of 2010, the claimant moved to Alabama. Upon relocating to Alabama, the claimant began treatment for her mental impairments at Northwest Alabama Mental Health Center. At her intake at Northwest Alabama on July 20, 2010, the claimant reported "feeling like a failure," sleeplessness, and poor concentration and memory. Medical staff at Northwest Alabama reiterated the claimant's diagnoses of Major Depressive Disorder and Generalized Anxiety Disorder. Staff at Northwest Alabama assigned the claimant a GAF of 43, a score that indicates serious symptoms. (R. 205-06). On August 17, 2010, the Winter Haven facility in Florida officially discharged the claimant as a patient. Attached to this discharge notice was a report of the claimant's last visit to the facility in May 2010. This report did not contain any new information but simply referenced the claimant's previous GAF score of 66, indicating only mild symptoms, which the claimant had received in May. (R. 212-14).

---

[4]Although the notes from the April 21 visit are nearly illegible, the diagnosis box on the report from this date says that the claimant's diagnosis was "MDD, GAD," presumably indicating a diagnosis of Major Depressive Disorder and Generalized Anxiety Disorder. (R. 227).

Following her discharge from Winter Haven, the claimant continued to seek treatment at Northwest Alabama. (R. 258-59, 303-328). In January 2011, Northwest Alabama staff described the claimant as "severely impaired evidenced by the inability to keep a job, staying locked in her room for days, not eating, not sleeping, poor hygiene, and paranoid delusions." (R. 258). While being treated at Northwest Alabama, the claimant received GAF scores of 43 in March 2011 (R. 315), 37 in October 2011 (R. 311), and 35 in March 2012 (R. 306), each of which indicates serious symptoms. The staff at Northwest Alabama consistently noted that the claimant was pre-diabetic, had allergies, and was menopausal. (R. 258, 306, 311, 315). The physicians at Northwest Alabama, however, only treated the claimant for her mental impairments. No corresponding record of treatment exists for these physical impairments.

At the request of the Social Security Administration, Dr. Syed Bhat performed a consultative physical examination of the claimant on April 14, 2011. Dr. Bhat reported that the claimant had a reduced range of motion in her hips and wrist, and that she had a history of arthritic conditions. At this examination, the claimant was 5'2" tall and weighed 200 pounds, indicating a BMI of 37, which is in the obese range. Dr. Bhat noted that the claimant's muscle strength was 5/5 in all groups, and that she had normal muscle tone, and no atrophy or abnormal movements. Dr. Bhat further noted that the claimant's extremity exam revealed no cyanosis, clubbing, or edema. (R. 265-70).

At the request of the Social Security Administration, Dr. Jerry Gragg performed a consultative psychological evaluation on the claimant on April 25, 2011. In his report, Dr. Gragg stated that the claimant was "adequately oriented in all spheres, and no significant impairments in memory functioning were noted." Dr. Gragg reiterated the claimant's diagnosis of Major

Depressive Disorder, but stated that the claimant "seems to have adequate intellectual functioning to be able to understand, remember, and carry out instructions," and "if adequately treated, [the claimant] should be able to handle work-related stresses." (R. 272-75). Dr. Gragg did not assign the claimant a GAF score during this evaluation.

On May 16, 2011, Dr. Guendalina Ravello reviewed the claimant's mental health records on behalf of the Social Security Commission. In her report, Dr. Ravello noted that the claimant suffered from affective and anxiety-related disorders. Dr. Ravello further noted that the claimant's mental impairments caused her mild restriction in daily living activities and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace. (R. 276-93).

On May 18, 2011, Dr. Robert H. Heilpern, a non-examining state agency doctor, reviewed the claimant's physical health records. Dr. Heilpern noted that the claimant alleged arthritis in her back, high cholesterol, obesity, and diabetes, but was not being treated or prescribed medications for any of these conditions. (R. 295-302).

On April 17, 2012, the claimant visited Dr. Denise Atmore, complaining of intermittent diarrhea. Dr. Atmore noted that the claimant received a diagnosis of pre-diabetes two and a half years earlier, but otherwise did not note any significant physical limitations. Dr. Atmore noted that the claimant's musculoskeletal system was normal. The claimant's medical records do not indicate any further treatment for physical impairments during this time period. (R. 329).

On May 8, 2012, at the behest of her counsel, the claimant underwent a second consultative psychological evaluation conducted by Dr. Alan Blotcky. In this evaluation, Dr. Blotcky reported that the claimant had "major depressive disorder, recurrent, severe with

psychosis." He also noted that some of the claimant's "verbalizations were morbid in content," she experienced auditory hallucinations, and her daily life was "extremely impaired," as she spent most of her time doing light housework, preparing simple meals, watching television, had no hobbies or special interests, had no close friends, did not socialize with peers, and did not visit family members. Dr. Blotcky assigned the claimant a GAF score of 40. (R. 334-36).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for social security benefits, the claimant requested and received a hearing before an ALJ. (R. 51, 58). At the hearing, the claimant amended her alleged onset date to July 20, 2010, the date when she began receiving regular treatment at the Northwest Alabama facility. The claimant's attorney asserted that the claimant's only severe impairments were her depression and generalized anxiety disorder. (R. 26-27).

At the hearing, the claimant testified that she had not worked anywhere since 2008. The claimant stated that she had tried to obtain other jobs, but often got fired because she had difficulty concentrating. She said, "I'm ADHD and I'm – every time I get a job, they tell me I'm too slow." The claimant indicated that she stayed in bed all day, sometimes for three and four days a week. She also stated that she cried a lot and had difficult sleeping. (R. 30-33).

A vocational expert, Mr. William Crunk, testified concerning the type and availability of jobs that the claimant was able to perform. Mr. Crunk stated that the major work the claimant performed in the past was as a caregiver, which is considered medium, low, semi-skilled work. The vocational expert testified that the claimant would not be able to perform her past relevant work because of the contact with the people that is necessary for that position. Mr. Crunk stated

that an individual with the claimant's characteristics could perform medium level work as a hand packer, a cleaner, or a laundry worker. Mr. Crunk testified that if the claimant's exertional level were reduced to light, then she could perform the jobs of a bakery worker, a laundry worker, or a cleaner.[5] The ALJ asked Mr. Crunk if an individual would be unable to work if they were "unable to interact with the public; unable to respond to customary work pressures; and . . . unable to maintain concentration through the standard periods of time between the breaks." Mr. Crunk agreed with the ALJ that these conditions would "render a person unable to work." (R. 42-47).

*The ALJ's Decision*

On July 27, 2012, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 6). First, the ALJ found that the claimant had not engaged in substantial gainful activity since the amended alleged onset date of her disability. Second, the ALJ found that the claimant had the severe impairments of obesity, arthritis, depression, generalized anxiety disorder, and low average intellectual abilities. (R. 11).

Next, the ALJ found that these impairments did not singly or in combination meet or medically equal the severity of one of the listed impairments. The ALJ considered sections 1.04 and 14.09 of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. These sections deal with disorders of the spine and inflammatory arthritis respectively. The ALJ determined that the information in the claimant's medical records concerning her physical impairments was insufficient to satisfy the requirements for either of these impairments. (R. 12).

---

[5] The court notes that when counsel for the claimant questioned the vocational expert, he testified that the claimant's past relevant work at the medium level would not transfer to a lesser level of exertion. (R. 46).

The ALJ also considered whether the claimant's impairments satisfied sections 12.04 or 12.06 in the listed impairments. (R. 13). Section 12.04 concerns affective disorders. Section 12.06 concerns anxiety-related disorders. To meet the requirements for these listings, the claimant must satisfy the criteria in both "paragraph A" and "paragraph B," or must satisfy the criteria in "paragraph C." To satisfy the paragraph B criteria, the claimant's mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.04.

The ALJ reviewed the claimant's medical history to determine whether her impairments satisfied the paragraph B criteria. He noted that the claimant's "GAF level ranged from 58 to 65 over a five-year period, prior to her move." (R. 13). The ALJ did not note any scores that fell outside of this range, such as the 40 the claimant received in 2009. A GAF of between 51 to 60 generally represents moderate symptoms, such as flat affect, circumstantial speech, and conflicts with peers or co-workers, while a GAF of between 61 to 70 represents mild symptoms.

The ALJ discredited the records of the Northwest Alabama facility based on discrepancies between the higher GAF scores the claimant received in Florida and the lower GAF scores the claimant received in Alabama. The ALJ incorrectly stated that the claimant received a GAF of 43 at Northwest Alabama in July of 2010, but then received a GAF of 65 at Winter Haven a month later. Based on this mistaken belief that large discrepancies existed between the claimant's July and August scores, the ALJ concluded that "[t]hese inconsistencies raise questions as to the veracity of her current treatment findings." (R. 13). The August 17, 2010

discharge report from the Winter Haven facility did not actually indicate a *new* GAF level though; it simply reiterated the GAF that the claimant received in her last visit to the facility in *May* of 2010. (R. 212-14).

The ALJ recognized that the claimant experienced some significant symptoms; however, the ALJ disregarded these symptoms because he concluded that they "appear predicated upon the claimant's longitudinal history of non-compliance with the treatment regimen during the period in question." (R. 14). The ALJ noted three instances of non-compliance: a January 2011 note that the patient was "noncompliant with PHP[6] and outpatient services" (R. 258); an April 2011 note that states that the"[c]lient became non-compliant with PHP services" (R. 327); and a January 2012 note that the claimant showed "resistance to our day treatment programs" (R. 305). (R. 14-15). The ALJ also cited the opinion of the consultative physician, Dr. Gragg, in which he stated that "if adequately treated, [the claimant] should be able to handle work-related stresses." (R. 275). The ALJ thus concluded that the claimant's mental health history was characterized by two distinct periods: the period of compliance with treatment in Florida and the period of non-compliance with treatment after the claimant moved to Alabama. (R. 15).

Consequently, the ALJ concluded that the claimant's mental impairments did not satisfy the requirements of paragraph B. He additionally found that the claimant's impairments did not satisfy the conditions of paragraph C because the claimant had not had repeated episodes of decompensation. (R. 15). Thus, the ALJ concluded that the claimant's impairments did not meet or medically equal the severity of any of the listed impairments.

---

[6] "PHP" refers to Prepaid Health Plan, the state-funded managed care system of mental health services and supports.

Finally, the ALJ determined that although the claimant could not perform any of her past relevant work, she could perform other jobs that exist in significant numbers in the national economy. The ALJ found that the claimant had the residual functional capacity to perform medium work except she could never climb ladders, ropes, or scaffolds. The ALJ relied on the testimony of the vocational expert in determining that the claimant could perform the representative occupations of a hand packer, a cleaner, and a laundry worker, all of which are jobs that exist in significant numbers in the national economy. Because the ALJ determined that the claimant did not meet the criteria of the listed impairments and that the claimant retained the capacity for work that exists in significant numbers in the national economy, he concluded that the claimant was not disabled as defined by the Social Security Act. (R. 16-19).

## VI. DISCUSSION

The claimant argues that the ALJ failed to give proper consideration to the opinions of her treating physicians. The court agrees with this contention and, accordingly, remands the claim for further consideration of the claimant's eligibility for benefits.

The ALJ must give the treating physician's opinion substantial weight unless he has "good cause" for failing to do so. *MacGregor*, 786 F.2d at 1053. "Good cause" for rejecting a physician's opinion exists in at least three situations. First, good cause is present when the opinion of the treating physician is accompanied by no objective medical evidence, is wholly conclusory, or is contradicted by the physician's own treatment notes. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *see also Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004)*.* Second, good cause is found if the "treating physician's opinion was not bolstered by the evidence." *Phillips*, 357 F.3d at 1241. Finally, good cause exists if the "evidence supported a

contrary finding" from that of the treating source. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). However, where medical evidence does not conclusively counter the treating physician's opinion, and no other good cause is presented, the Commissioner cannot discount the treating doctor's opinion. *Schnorr,* 816 F.2d at 582.

The ALJ in the present case discounted the opinions of the claimant's treating physicians for two principal reasons: (1) he found that her treatment records at Northwest Alabama were inconsistent with her previous records at Winter Haven, and (2) he found that the claimant's worsened condition was based on her history of non-compliance with treatment. (R. 13-15). This court finds that neither of these reasons constitutes good cause for disregarding the opinions of the claimant's treating physicians at Northwest Alabama.

The ALJ first based his rejection of the treating physicians' opinions on inconsistencies between the claimant's previous records in Florida and her current records in Alabama. The ALJ suggested that the claimant's August 2010 discharge summary from the Winter Haven facility cast doubt on the report from Northwest Alabama only a month earlier. However, this discharge summary merely referenced the last time the claimant visited Winter Haven in May 2010. It did not state any new findings. In May 2010, the claimant received a GAF score of 66 at Winter Haven. (R. 214). In July 2010, at her intake at Northwest Alabama, the claimant received a GAF score of 43. (R. 206). In August 2010, Winter Haven discharged the claimant. (R. 214). The ALJ used these records to show that the claimant's condition had drastically improved just a month after she moved to Alabama. In reality, the claimant's GAF score did not return to 65 as suggested by the ALJ, but instead remained low. Consequently, the ALJ erred when he misinterpreted the claimant's August 2010 Winter Haven discharge summary.

This erroneous interpretation of the Winter Haven discharge summary led the ALJ to question the "veracity of [the claimant's] current treatment findings" at Northwest Alabama. (R. 13). Because the ALJ erred in interpreting the claimant's medical records, this point does not provide a sufficient basis for disregarding the opinions of the claimant's treating physicians after her move to Alabama. The ALJ must base his rejection of a treating physician's opinion on good cause, and the erroneous interpretation of the claimant's medical records does not constitute good cause.

The ALJ not only erred in his assessment of the August 2010 discharge summary, but he also erred in choosing to give weight only to the evidence that supported his decision. The court must consider all of the evidence in the record, not just the evidence that is favorable to the ALJ's decision. *See Hillsman*, 804 F.2d at 1180. A decision is not based on substantial evidence if it focuses on only one aspect of the evidence while disregarding other, unfavorable evidence. *McCruter*, 791 F.2d at 1548.

The ALJ characterized the claimant's progress positively, stating that the claimant's GAF level "ranged from 58 to 65 over a five-year period, prior to her move." (R. 13). While the claimant did have scores in this range during this time period, she also received GAF scores outside of this range. For example, in 2009, just a year before her move to Alabama, the claimant received a GAF score of 40. (R. 220). The ALJ failed to account for this score. The ALJ only considered the claimant's higher GAF scores from Winter Haven, disregarding completely the lower 2009 GAF score of 40, and using these higher scores to discredit the claimant's more recent, lower GAF scores from Northwest Alabama. After moving to Alabama, the claimant received several low GAF scores: a 43 in March 2011 (R. 315), a 37 in October 2011 (R. 311),

and a 35 in March 2012 (R. 306). The ALJ did not account for these scores. Accordingly, when examining all of the evidence, the GAF scores from the claimant's treating source at Northwest Alabama reflect a consistent decline in the claimant's mental condition after her move to Alabama. The ALJ's misinterpretation of the claimant's medical records and selective consideration of the evidence does not provide good cause for rejecting the treating physician's opinion.

The ALJ's second reason for rejecting the opinion of the claimant's treating physician was that the claimant was non-compliant with her treatment. The ALJ correctly noted three instances in which the claimant was non-compliant or resistant to treatment in Alabama. (R. 258, 305, 327). However, these instances do not amount to substantial evidence in support of the ALJ's conclusion that the claimant's worsened mental condition was attributable to her non-compliance with treatment. The ALJ did not mention or justify the claimant's low GAF scores of 43, 37, and 35 at Northwest Alabama. (R. 306, 311, 315). The medical records from these dates did not indicate any non-compliance. In fact, these reports stated that the claimant was "cooperative" and had a "positive history with treatment." (R. 315). The ALJ does not address these low GAF scores or indicate any way in which these scores can be attributed to the claimant's non-compliance. The ALJ failed to adequately review the entire record and to determine whether these instances of non-compliance were the cause of the claimant's worsening condition or whether they were merely symptoms of her depression.

Moreover, the ALJ may not substitute his judgment for that of the physicians and draw his own medical conclusions. *Hillsman*, 804 F.2d at 1182. In the instant case, the ALJ did not rely on a medical expert's opinion for his conclusion that the claimant's worsening condition was

attributable to her own non-compliance with treatment. The ALJ relies on the three times that non-compliance or resistance to treatment is mentioned in the claimant's medical records and the opinion of Dr. Gragg that "if *adequately treated*, [the claimant] should be able to handle work-related stresses." (R. 258, 275, 305, 327) (emphasis added). Dr. Gragg's report does not conclusively state, however, that the claimant's condition was a result of her own non-compliance with treatment. No physician stated that were it not for the claimant's non-compliance with treatment, her mental condition would have improved. Because the ALJ failed to consider the entire record and drew his own conclusions regarding the effects of the claimant's alleged non-compliance, the claimant's non-compliance does not amount to good cause for the ALJ's rejection of the treating physicians' opinions.

In his brief in support of the Commissioner, the Assistant U.S. Attorney contends that the ALJ was not required to give weight to the treating physicians at Northwest Alabama because the only legible signature on the claimant's records is that of Teresa Taylor, MA (Master of Arts), ALC (Associate Licensed Counselor). This deficiency was not the basis the ALJ used for discrediting the opinions of the physicians at Northwest Alabama. Each of the Northwest Alabama records is initialed in the block for Psychiatrist Signature. (R. 205, 304, 309, 314). Some of the records contain complete signatures. (*See* R. 210, 259, 318). Each of these signatures, although admittedly hard to read, suggests that an appropriate medical source treated the claimant at Northwest Alabama. The ALJ did not challenge the authenticity of these records, and likewise, neither will this court.

## VII. CONCLUSION

For the reasons stated in this memorandum, the court finds that substantial evidence does

not support the ALJ's findings. The ALJ failed to show good cause for rejecting the opinions of the claimant's treating physicians. Neither the alleged inconsistencies in the claimant's medical records nor the claimant's alleged history of non-compliance provides good cause for the ALJ's rejection of the treating physicians' opinions. Therefore, the court will reverse the Commissioner's decision and will remand it to the ALJ to determine whether the claimant is entitled to Disability Insurance Benefits or Supplemental Security Income Payments.

The court will enter a separate Order.

DONE and ORDERED this 14th day of November, 2014.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE